We'll hear argument next in Case 24-889, Hikma Pharmaceuticals v. Amarin Pharma. Mr. Klein. Thank you, Mr. Chief Justice, and may it please the Court. Under Section 271B of the Patent Act, selling a product suited for both infringing and substantial non-infringing uses is lawful, unless the seller actively induces the infringing use. Congress later passed Hatch-Waxman Section 8 to ensure that one infringing use will not foreclose selling a generic drug for a second non-infringing use. So public statements entirely consistent with selling skinny-labeled generic drug products under Section 8 cannot actively induce infringement. Under our approach, and the one advanced by the United States, actively induced infringement, when dealing with statements, requires a clear message that necessarily promotes infringement. The Court applied this standard in Groxer and more recently in Cox. Active inducement cannot depend on whether doctors might read infringing instructions into product descriptions that on their face are entirely consistent with non-infringing use. Ameren argues that generic drug companies must constantly discourage infringement with disclaimers that are explicit, but that turns the statute on its head. Agreeing with Ameren, the Federal Circuit basically swapped the statutory term active for its antonym, passive. And under the decision below, patent lawsuits filed after skinny-labeled product launches will routinely survive a pleading challenge. This shuts the Section 8 pathway down. Generic companies won't choose that pathway if, at best, it means paying millions in legal fees, and at worst, a massive damages award. Reversal is needed to harmonize Section 8 with Section 271B, and to encourage legitimate competition that reduces drug prices. I welcome the Court's questions. Wouldn't it have been safe to just simply say that the generic drug was only approved for the SH indication and nothing more? Your Honor, HICMA did say that when it launched its product in the November press release, and it did say that on the accused's website, but the law does not require that. In Groxer and Cox, the Court made clear that failure to take affirmative steps to prevent infringement is not what the standard- But what if you, what if a respondent had engaged in a certain degree of self-adulation and said that this is a great product for this, that, or the other, and you merely quoted it? Wouldn't that almost be baiting people into, or inducing people into using the product more broadly than the unpatented use? The hypothetical is a little vague, but if HICMA or a generic were to send a clear message that- Well, not using your language, but using their language. They have patented uses that they think are great, but you could, why didn't you, you simply quote them, wouldn't that be a way to induce? If HICMA quoted Ameren with regard to its cardiovascular use, that could plausibly state a claim if it's a clear message that necessarily promotes infringement. The Groksa Court addressed a similar type of situation when distinguishing the Sony case. And distinguished statements like record favorite shows on your Betamax. And said, that does not encourage conduct that necessarily infringes, and therefore, that's not actively induced infringement. And if you don't actively induce infringement, you fall under section 274. I think what I'm asking you is, is there only way to actively induce infringement is overstating or your own statements sound as though the patented use is covered by your product. As opposed to simply quoting the respondent's website or statements about its product, which is patented. I'm not saying there's any kind of magic word standard. And if the generic basically adopts by reference statements by the brand that would encourage the infringing use, then that could plausibly state a claim. Do you need any of the special rules that you're claiming we have to announce to win this case? Does this pass Trombley and Ichabell? It does, and our- It passes Trombley and Ichabell? Our case, yes. Yeah, meaning- Easily. The complaint here- The complaint- Is adequate under Trombley and Ichabell? I'm sorry, I'm sorry, I thought you, I misunderstood the question. No, the complaint does not pass the standard for plausibility under Trombley and Ichabell. Our argument is- That's the point, which is you're asking us to announce rules that almost impossible in this area because determining whether or not there's active inducement is always contextual. I think Grosker said that one of the factors it used was that the name that the infringer was using was suggestive of the infringement. So that wasn't the express statement of any way to infringe, it was just a suggestion. But in context with other things, it reached active inducement. I'm asking a very simple question. You don't need all of the things you've been arguing about to win under Trombley and Ichabell, correct? That is correct. The statements here, as the government called them, were anodyne. They were unoffensive. They were entirely consistent. Now, I do know that we make life hard because we say we're not going to take on error correction. So you had to make up a rule of some sort. But it seems like everything you say, like somehow you need express statements as opposed to what we have said, you need active inducement. You want to change the words, but do we need to change any of our standards for you to win? No, Your Honor, because there are obvious alternative explanations in view of the anodyne statements. Every single accused statement has an explanation that is entirely consistent with non-infringement. All right, thank you, counsel. Can I ask you a similarly straightforward question with respect to Ameren's allegations concerning the label? I'd understood that by statute, generics have to have a label that essentially, in all relevant circumstances, mirrors the brand label except for just admitting the patented indication. Is that correct? That is correct. It's called the sameness requirement. That's by statute. So even if Ameren is right, that it thinks that Hickam could have or should have excluded a certain study or included some other information. If those aren't on the original label, Hickam can't do that. Hickam cannot change the label, but I want to be clear about something because Ameren supplied to the FDA these sections that Ameren thought pertained to its patent. And then the way the FDA, the skinny label process works is the FDA compares what Ameren says is patented in the label to the proposed skinny label. And it's a ministerial role. If the generic carved out everything that the brand said is patented, then the skinny label can be approved, and the generic can't add new disclaimers or new- Or anything else, and it can't be accused of inducing infringement by refusing to put things on the label that the brand didn't have, right? That's true because of the statutory scheme. That's true because a Grokster and Cox says the statute doesn't require active discouragement of infringement, and for all of those reasons. I also want to point out how Grokster warned against trenching on regular commerce. And that is exactly the situation here, because the regular commerce we're talking about here is commerce that's encouraged by Congress. It's section 8 skinny label products. And as a practical matter, under the decision below, you can get FDA approval of your skinny product label. But as soon as you put that product into commerce and you say anything about that product, anything, you call it a generic version, even if you have disclaimers, you can be sued. And that lawsuit will survive a pleading challenge. And that sends a terrible message to the generic industry. Hatch Waxman was designed to resolve patent disputes before a product launch for the reason that it's an economic reason. Once a generic launches its product, its profits will be much, much lower than the brand's profits. And so if the generic gets hit for a lost profits damages award, that's devastating. This happened in the GSK case with Teva. And Teva got hit for hundreds of millions of dollars that dwarfed its actual profits. And that is what the decision below is encouraging. And that's why we are urging the court to reverse. Anything else? Anything else? Thank you, counsel. Thank you. Mr. Stewart? Thank you, Mr. Chief Justice, and may it please the court. I'd like to begin with two very brief observations. The first point is that although the federal circuit appropriately said that the label itself was not sufficient to get the Ameren past 12B6 in this case, we think the court of appeals erred in giving any weight at all to the label. The contents of a Hatch Waxman skinny label are largely dictated by federal law. And to treat the generic manufacturer's compliance with those requirements as any evidence of intentional inducement to infringe would be wrong. The second thing is when respondents explain in their brief why they've sued HICMA but haven't sued any of the other generic manufacturers of e-ethyl, their explanation is all of those other manufacturers included in press releases expressed disclaimers to the effect that their product is not authorized for use to treat the CV indication. But it's a bedrock principle of inducement law that active inducement to infringe is required. The question is not whether the defendant has adequately warned people away from infringement. I welcome the court's questions. What would a respondent have to have alleged to survive a motion to dismiss? I think they would have had to- In your world, not the fed circuit's world. In our world, the respondent would have had to identify statements or actions that had the clear purpose of causing others to infringe as something that the brand wanted to bring about. The court in Grokster said it was with reference to copyright, but it was drawing on copyright and patent law principles. The court said one who distributes a device with the object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement, is liable for the resulting acts of infringement by third parties. And so they would have needed to point to statements or actions that clearly revealed a purpose to induce infringement. What role, what impact is it that occurs in states that encourage the use of the generics for the patented use? What does that have on the problem that the respondent is having? I mean, I think one of the principles that emerges from this court's case is, and from Cox most recently- No, I don't mean on this. I mean with the problems of the unpatented, the generic being used for uses that are still patented by respondent. I mean, the preliminary point I would make is the perceived difficulty or the actual difficulty of going after the direct infringer or getting the direct infringement to start, to stop, is not a justification for watering down inducement principles. Now, there are other things that respondents could try to do, and some of them they have tried to do. They sued Health Net in this case, and they separately alleged that the health insurer, through its reimbursement policies, was encouraging pharmacies to fill the drug- But aren't some states doing that too? I mean, states certainly have these generic substitution laws, and I'm not sure to what extent states are regulating the health insurers. But certainly, Ameren and similarly situated companies could urge state legislatures to take measures to prevent this from happening. The other thing they could do, I understand they don't want to sue the doctors, but they could attempt informational campaigns to doctors and tell the doctors, our product is the only one that is authorized to be used for the CV indication. It would be infringement of patent to administer ecocepat ethyl for the purpose of reducing cardiovascular risk. And the doctor really is in the best position of any single actor to say, for what purpose am I prescribing the drug? And at least in theory, could figure out, is there a patent on one method of use? And adjust prescribing practices accordingly. I understood that the test that you articulated is that the, what was required is that the generic person clearly reveal a purpose of infringement. Is that? Acts or messages that reveal a clear intent to encourage infringement. That's a pretty broad safe harbor. I mean, you really just have to have a seminar on your first day of work and say whatever you do, don't do that. It's pretty easy, it's a pretty high threshold, low threshold. I mean, it is supposed to be a difficult standard for the pleader to satisfy, but I think that's for design. That is, the court has said in various contexts that when a product is capable of both infringing and non-infringing uses, it's important that a patent on one method of use not become a de facto monopoly on the product as a whole. And so it's supposed to be feasible for people in Hikma's position to market their product for the unpatented use without running afoul of liability for third parties who choose to use the product in infringing ways, unless they have affirmatively encouraged that to be done. The mere knowledge that it will be done or the expectation that some people will infringe is not enough. And the risk of liability and what it could do to a generic I would think would be pretty significant. It's very substantial in part because the generic is charging typically a lot less for the drug than the brand name manufacturer is. And so if the generic has to pay lost profits to the brand name, the profits that the brand name would have earned on a particular volume of sales would be much more than the generic has actually- And the product is substantially similar. I mean, that's why it's a generic. So, in other words, there's no defense that, well, we really have a different product here, it's the generic of the drug. And so if they're also liable absent active inducement for people taking their generic and using it in an infringing way, you would think that could happen a fair amount and that it would really be a risk to the bottom line of this generic company. Yes, I mean, there is more than an intimation in the respondent's brief that Hickman was doing something wrong by describing its drug in press releases as a generic version or a generic equivalent of Vasipa. But in fact, that's a normal thing to say. It really refers to two different things. One of them is, under the abbreviated new drug application process, the generic comes on the market not by conducting independent studies of safety and efficacy, but by showing that it is equivalent to a drug that's already been found safe and efficacious. And so when Hickman says we're the generic version of Vasipa, they just mean Vasipa is what's called the reference listed drug. It is the drug as to which we've established equivalence in order to get approval. The second thing is that the patents in these cases refer to methods of reducing cardiovascular, risk of cardiovascular events or cardiovascular death. And the method they describe is the use of what the patent refers to as ethyl eicosepantate in various ways, a series of steps with certain types of  And everybody agrees if Hickman's drug is used to reduce the risk of cardiovascular death or events through the performance of those steps, infringement will occur. The reason that's so is that Hickman's drug is ethyl eicosepantate. It's the same stuff. And it's the same stuff for infringement purposes, but it's also the same stuff for describing the product. Can you explain the United States' concerns about the broader market implications of the decision? I mean, I think we would divide what the Federal Circuit relied on into three categories. The one we were most concerned with was the skinny label because all of the things that Ameren is complaining about are things that were on the brand name's  And the rule is the generic is supposed to use the same label as the brand unless there's a good patent-specific reason to take things off. And so the Federal Circuit, I think, thought it was being limited by saying the label by itself is not enough to get past 12B6. But the flavor of its opinion was this is almost enough. And if you have some pretty ethereal stuff in addition, that will be enough to get you over the hump. And we think it shouldn't have attached any weight to the label. Hickman just did what it was supposed to do. And then the second thing is the description of the Hickman's generic product as the generic version. I understand that, but the implications of the decision in the marketplace at large, I understood. Do you want to speak to that or not speak to that? Yes. I mean, I think the FDA's view is it is too soon to tell exactly what the effects of the Federal Circuit's decision would be on the willingness of other generic manufacturers to enter the marketplace. And in part, I assume that generics are waiting on this court's decision in this case. But we certainly think that if the Federal Circuit's analysis were affirmed, that it would create a substantial disincentive to entering the generic market. What if Hickman had not just said its drug is generic, the SEPA, but went on to say that the SEPA is approved to treat cardiovascular risks? I think if it had said those two things in the same breath, that you would have a pretty strong case of active inducement, that it would not take much work to connect the dots, that this is something the SEPA has been approved for and ours is the same stuff. What if it had said studies have shown that ecosapent ethyl, the active ingredient in our drug, reduces cardiovascular risks? I think that would be problematic as well, although probably closer to the line. But one thing I would say about the label is when Hickman prepared its skinny label in conformity with the rules, the most obvious thing it took off of Ameren's label was the indication at the beginning. But a second thing that it took off of Ameren's label was in the clinical studies section of Ameren's label, Ameren summarized the results of what they call the reduce it study, which was designed to test the efficacy of the product for reducing cardiovascular risks. And the study concluded that the SEPA was efficacious for this purpose. I see a red light is on. I ask the same question of you that I asked of Petitioner's Council. Do we need your new definition that you gave the chief or saying again that following the label alone, exactly what the Federal Circuit said is not enough? Do we need any special rules? I don't like to prefer Petitioner to win. I don't think you need special rules that you are interpreting Section 271B, which is not specific to Hatch Waxman. It's just the general inducement provision. And we think application of the general rules is it's enough. Okay. And then finally, there's a whole lot of discussion about congressional policy, both in your brief and in Petitioner's brief that they wanted to encourage this and we should rule that what active infringement means in patent law is very narrow because of that. I always have problems when we use policy reasons to set a standard. That's not our job. If they're infringing a patent, they're infringing a patent. If they're not infringing a patent, they're not. But why should we change our rules, narrow them or expand them to avoid either result? I basically agree. I don't think it's a main matter of changing the rules. We have described the Hatch Waxman scheme at some length because it's pretty complicated. But in the end, Hatch Waxman embodies the same basic principles as the Patent Act generally. Namely, if you sell something that can be used either in an infringing or a non-infringing way, then you still won't be held liable for others' infringement unless you've actively encouraged them to infringe. That's the bottom line. Correct. Thank you.  Mr. Stewart, your point about not looking to the skinny label in a suit like this, I guess the reasonableness of that depends on how much patent review the FDA is doing when it approves the skinny label. So what's the answer to that question? I mean, I think the Court discussed this in Carrico. The FDA has disclaimed patent expertise, and so it doesn't purport to read patents and determine what conduct would infringe them. But respondents suggest that the result is we take the generics word for what is and isn't infringing, and I think that's not correct. As the Court explained in Carrico, the brand name manufacturer will provide for the orange book what's called a use code, which will describe what it believes its patents cover, and the FDA considers itself bound by the use code. And so if the brand name is saying this wide range of uses would be patented, the FDA won't look behind that. There is a counterclaim mechanism by which the generic can obtain judicial review of the brand's behavior in a suit between the two private parties. But kind of the bottom line is here there was really no dispute about what was patented. If there had been a dispute, FDA would have deferred to the brand's own description of what its patent covered. And then the question would just be, has the generic carved out enough of the label to excise references to the patented use? And what I was saying before about the clinical studies, although Ameren's label had a description of the Reduce-It study that was about efficacy of the drug for treating cardiovascular, preventing cardiovascular events, HCMA omitted that from its own label. So it didn't just omit the indication, it omitted another part of the label that referred to the efficacy of the drug for that purpose because the purpose was still patented. Thank you. Justice Gorsuch? Justice Kavanaugh? Justice Barrett? Justice Jackson? Can I just ask you, what is the relevance of the state laws that you cite permitting or requiring substitution of generics for brand name drugs in this context? I would think those would be relevant to an Ameren lawsuit, maybe against a third party, but I don't know why they matter here. I mean, I think the court can decide the case without referring to them. We had two basic reasons for including some discussion. The first was we didn't want the court to decide the case based on a misimpression of the facts or the way the world works. And I think portions of the court of appeals opinion are written as though in each case, the doctor who's writing the prescription determines which version of the drug will be dispensed and that will carry the day. And we wanted to explain in the real world, it's more complicated than that. And kind of conceivably in some future case, that could matter given the way it was pleaded, because you'd have to show in light of these laws, how is it plausible that what we said would cause somebody to infringe? I see. Thank you, counsel. Thank you. Mr.  Mr. Chief justice, and may it please the court. The implications of this court's ruling in this case will go far beyond the pharmaceutical industry. This is not really a hatch Waxman case at all. It's not really a skinny label case. Hikma got the full benefit of the hatch Waxman compromise when it was permitted to sell its product for FDA with an FDA approved skinny label as a treatment for severe hypertriglyceridemia. But in exchange, Hikma was required to promise not to promote its product for any still patented use of Ameren's branded drug. That limitation on generic marketing of their products is absolutely vital. It is the only thing that makes it economically rational for a branded company like Ameren to spend the $300 million that Ameren spent in the reduce at trial to discover that an existing drug, the SEPA actually had life changing implications to treat cardiovascular risk. And that rule of induced infringement liability is not unique to pharmaceuticals. This court's interpretation in this case will be of section two 71 B of the patent act. That is the statute that protects all patented innovations in this country of whatever kind the standard for induced infringement liability is settled. In most cases, the key dispute is going to be whether the defendant had the requisite intent to infringe, but Hikma has not contested its intent as this case comes to the court because the case is at the pleading stage. Nor has Hikma disputed that there was substantial direct infringement of Ameren's patents using Hikma's product. So the only element that's in dispute here today is whether it is plausible that Hikma took active steps to encourage that infringement. It is plausible. There are seven other generic manufacturers of icosapent ethyl on the market, but Hikma alone was the one who described its product as AB rated for hyper triglyceridemia, even though that product is not approved for that distinct medical condition. Hikma alone repeatedly used Ameren's brand name, Vasipa, just at the moment when that name was synonymous in the market with treating cardiovascular risk. Those statements and more by Hikma that other generics did not use state a plausible claim. I welcome the court's questions. Uh, was there anything inaccurate about that statement? Yes, there absolutely was your honor. And I want to just say for there, it wasn't accurate. I also don't think frankly, it matters whether it was inaccurate. A statement can be absolutely true. Imagine a statement that Hikma said you can use and should use our product to accomplish exactly the same medical purposes as Vasipa, including cardiovascular risk. The kind of example that I think justice Alito gave to my friend, Mr. Stewart. And I heard Mr. Stewart say that would state a claim for a strong claim for induced infringement. I agree with that. So truth is not a defense to liability in an induced infringement situation. So what if they simply quote you? I think they can't, they cannot do that. Your honor, because the whole point of the compromise is that Hikma is allowed to market its product, but only for the unpatented use only as a treatment for severe hypertriglyceridemia. If Hikma comes on and quotes Ameren's marketing of its product to treat the, for the patented purpose, that's the most classic case of induced infringement. That's like the literal textbook definition of induced infringement. I also do think it's important to say though, that the key statement on which we rely here, the statement on Hikma's website where it described what its drug is for was not accurate. Hikma said its product was for treating hypertriglyceridemia. That's misleading, if not false, because Hikma's product was approved by FDA only to treat severe hypertriglyceridemia. And that's a distinct medical condition that presents distinct medical risks. Well, if that's your best piece, and I think it probably is, that website, what do you do with it? There was a further disclaimer on the website saying that the product was, uh, Hikma's generic version is indicated for fewer than all approved indications of the reference listed drug. Sure, your honor. So two points about that disclaimer, which is a JA 195. First, as you can see, even on the blown up version in the joint appendix, it really appears in quite tiny print. But even if the some, even if somebody read it, even if they saw the disclaimer, just as your honor read, all it says is Hikma's product is approved for fewer than all uses of Vasepa. It doesn't disclaim that Hikma's product can and should be used to treat the most famous use of Vasepa, the billion dollar use, which is saving patients' lives by treating cardiovascular risk. So there's nothing, the disclaimer is, I think at best, carefully worded. It's sort of written by a clever lawyer to try to minimize Hikma's liability while still sending the fundamental message that is coming across by all the collection of Hikma's statements that says doctors can and should prescribe Hikma's product anytime they would prescribe Vasepa, including to treat cardiovascular risk in a way that infringes Ameren's patents. So I, Oh, I just think having rang the bell, your honor, having repeated when Hikma has come onto the market repeatedly and said, we are generic Vasepa, generic Vasepa, generic Vasepa, billion dollars in sales. Our product is for hypertriglyceridemia. Having made all of those offensive statements that are calculated, that have the intent to induce infringing sales, that tiny little sort of cleverly worded disclaimer, I don't think is sufficient to pull that back. Mr. The impact of this case, that would be more broad, that it would extend beyond just the pharmaceutical industry. It seems to me, this is a pretty fact bound case about the plausibility standard. Um, I don't know that we have to, to reach any kind of greater issue. So do you see the case that way? Is this just kind of applying twick ball to this particular complaint? I do see the case that way, your honor. We, we are, that's what we argued in our brief in opposition. Um, uh, and I think that it's not this court's typical practice to grant a case that asks merely whether the facts as pleaded under the, you know, a settled legal standard states a claim. All that said, uh, you know, of course we, we, we, we continue to think, and I, I do want to think, I do think it's very important to say. It is important, uh, as I think the, was the premise of justice Sotomayor's questions that the court not adopt a new induced infringement standard with words like express promotion is required. I can't, I just can't understate the extent to which that would be a transformation of the scope of patent law. So if the court is going to simply apply Twombly and Iqbal to the facts of this case, and I do think that's the right approach to the case. Um, then I continue to think that the key question in the case is in, in, as in most cases of induced infringement, what was the message that the doctors who read these HICMA statements took away? And that's a question is a fact question. And, you know, justice Alito observed the other day. I'm not sure why this case is here, except four of my colleagues wanted it to be. Um, but if it is a fact bound question, what I'm asking is if the case is, as you just described it, what's the broader impact, you know, in the, in your, are you talking about broader impact solely if we reached some new rule? Yeah, no, I, I'm totally, let me, I appreciate the opportunity to clarify. If the court says that even though this case is at the pleading stage, even though it's only a plausibility pleading standard, these allegations of intentional stigma and intentional statements by HICMA where intent is undisputed, that that doesn't even state a claim for relief, I do think that's going to have serious implications. It's going to make it much, much harder to plead induced patent infringement. And I think that's going to have implications both in the patent space more generally, but even in the pharmaceutical space, because as I mentioned, if, if a, if a branded drug like Amarin cannot get any kind of protection for a new, newly discovered use of its existing drug, it would just be economically irrational to make that kind of investment that discovers a lifesaving cure. And I think that's what we are really fighting for in this case is the opportunity to say, we spent five years, we spent $300 million and we discovered something that is literally saving people's lives. HICMA wants to come, and having spent no money basically at all, and try to capture all of those gains. The patent law doesn't allow them to do that. They are allowed to sell their product for the unpatented use. But when we have discovered this game-changing, quote, new use, HICMA can't come in and try to capture those, those, those sales. That's what it did with its repeated statements by calling itself generic a SIPA over and over again. By mis- Would, would you contest, Mr. Houston, that these press releases were really issued for investors, that they had nothing to do with, this was not the way the company marketed itself to doctors? I, I would contest that, Your Honor. I, especially because we're at the pleading stage where all inferences that are fair have to be taken in our favor. I think HICMA's claim that these were directed at investors is really just grounded in the fact that there's a contact us section of the press release that allows you to get in touch with the investor relations team, in addition to other kinds of, you know, phone numbers provided. So, they're not consciously directed at investors, they're not expressly directed at investors. And I think two other points about that. First, HICMA spread these messages far and wide. It wanted- I mean, is there any evidence at all that HICMA directed these to, to the medical community, that HICMA gave these press releases to doctors? So, I, I think the answer is yes, in the sense that these, this is advertising, Your Honor, which is, as Grokster said, a classic form of induced infringement since common law. HICMA, the, the, our allegations are, we don't have evidence, we're at the pleading stage, but the allegations we have are that HICMA took these press releases and intentionally attempted to make them get distributed as far and widely as possible. It did want doctors to see these things, and evidence has come in, in other cases where doctors have testified that they do pay attention to press releases, and that they do pay attention to the announcements of when generics are coming online. And those kinds of announcements do affect doctor's prescription decisions. So, that's all evidence that, you know, we're going to put out, you know, that, those, we're going to use the federal circuit's established standards for pleading, for proving induced infringement claims. It only has to be plausible at this stage, and I don't think it's a fair inference. The, I don't think you can say the only fair inference from HICMA statements is that they were directed solely at investors and were not going to reach doctors. But I guess to your initial statement when you started out saying this is not a Hatch-Waxman case at all, I think you said that, and to why this case is here, because I'm glad it's here, the federal, Congressman Waxman filed an amicus brief, and I don't want to put too much faith in a former congressman's brief about his own statute, but it says the federal circuit's decision threatens to decimate the compromise at the heart of the Hatch-Waxman Act, which in turn threatens to undermine the generic pharmaceutical industry. If this kind of complaint's good enough, and points out, you know, generics have saved 3.4 trillion over the past 10 years, but the federal circuit's decision here leaves generic drug companies in the dark about what might expose them to liability. All of which is to say, I think the question is, you know, if this is good enough, then that's going to have some serious implications market-wide. So, Justice Kavanaugh, maybe two or maybe three points, if I might, in response to that. First, when we say if it's good enough, all we mean is good enough to get out of the starting gate, to get into discovery where we're going to have the opportunity, we're going to be held to the burden to prove everything that we allege. That's the first point. The second point about Hatch-Waxman is that the reason it's named Hatch-Waxman, of course, is that it was a fundamental compromise, and on the other side of that compromise was about protecting the need to encourage branded drugs to take existing products and invest massive resources to discover how those drugs can be used for new cures. The dark green briefs are replete with examples of situations where that has happened. It can only happen, it's only economically rational to occur if they can get patent protection for that subsequent use. And then I think the last one... The last point that, you know, I take it seriously when someone says this is upsetting the compromise. Well, I think the last reason why the Court can have confidence that that is not going to come to pass, Your Honor, is the example of the many other generics who sell the very same product that HICMA does. And we haven't sued any of them. And you can look at what they say on their press release to know that generics have a ready roadmap to avoid induced infringement liability. All they have to do is accurately describe the limited purpose for which their drug is approved. So, for example, Canberra, one of the other generic manufacturers, it says Canberra's press release is indicated as an adjunct to diet to reduce triglyceride levels in adult patients with severe hypertriglyceridemia. It doesn't talk about generic Visepa. It doesn't talk about the volume of sales of Visepa and say this is a billion-dollar revolutionary drug. It doesn't say that it is in a therapeutic category of hypertriglyceridemia. And, again, that's a different medical condition. So, Canberra, Zytus, Dr. Reddy's, none of them do the things that HICMA did. I'm just saying generic Visepa would be enough. I do not think, Your Honor, that merely saying one time generic Visepa is enough to state a claim for liability. And that's not our allegation. Our allegation is that HICMA said it over and over and over again and that they did it at just the key moment where there was a market, a key market association between Visepa and treating cardiovascular risk. That was the context. Grokster says, of course, that induced infringement is a context-dependent analysis. That was the context into which HICMA launched these statements over and over and over again. But I take the point, I'm certainly not here to say that a company that one time says generic Visepa is going to be held liable. As the Federal Circuit held, HICMA did much, much more. It made statements that no other generic manufacturer But, counsel, I guess it seems to me you do emphasize that we're talking about plausibility and this is early in the case and we're at the motion to dismiss stage. But that does highlight what has to be plausible. What is the focus of this? And the government here, the SG, says what we're looking for is an intent on the part of this manufacturer to be inducing people or to have doctors be using this drug for the patented purpose. Your standard, as far as I can tell, is more just what message would the doctors have taken away from the marketing materials? And as Justice Kagan pointed out, at least some of these marketing materials, I think, were directed to investors. So if the intention of the generic is to mention Visepa and the size of the market, et cetera, et cetera, for the purpose of getting investment, not for the purpose of inducing doctor infringement, what do we do with that in terms of understanding whether active inducement liability lies? A couple of points about that, Justice Jackson. I think the first is that, of course, at this stage of the case, you can't just take Hickman's assertion that, oh, we put out that press release for the purpose of talking to our  No, but it's your burden if we are supposed to be looking for intent, and I guess that's why I think we do have to kind of focus on what the legal standard is here. If we are looking for intent to induce infringement, then I would think it's your burden to actually have statements and evidence that go to that. And if we look at those statements and we say, yes, we see them, but really those statements that you point to are indicative of an intent to encourage investors, then why have you stated enough of a claim in this circumstance? I understand the question, Your Honor, but I want to stress the Federal Circuit found that it was undisputed, that's their word, that Hickman did not contest the requisite intent. That's at Pet. 15a. Hickman's motion to dismiss in this case did not say, unlike most other skinny label cases where intent along the lines of Your Honor's question would very much be the focus and where I'm sure Hickman at trial will attempt to prove exactly the kinds of things that you're saying. But is the Federal Circuit right about that? Yes. I don't know that we can disaggregate. I mean, they might have — Hickman might have said we're not really focused on our intent to induce something or our intent to have people buy more of this product. But if the active inducement element of this is what we're all focused on, and active inducement requires an intent to induce doctors to use this product, then I don't know that their concession about intent really covers this particular circumstance. So, Your Honor, I mean, the Court has always talked about those as distinct elements of induced infringement. There are three elements. There has to be direct infringement. Somebody has to do the infringing. And then the inducer has to both have the intent that that happened and take active steps. I understand. But the United States today said the active inducement — active steps prong of this is statements and acts that are — that demonstrate an intent to induce the doctors. So they brought intent into the very element we're talking about here. There's no way to reconcile that conception of the standard with this Court's case after case after case. So they're wrong about that. They're wrong about — they're just distinct elements. And the intent element isn't part of this case at this stage. I'm sorry to interrupt. Go ahead. I'm just — I just want to say that, I mean, the Court has always talked about them as distinct elements. The Federal Circuit found that Hickman had not contested the intent element. I think, actually, I thought it was common ground between all of the parties that we're only here talking about what constitutes active steps. These are active steps in the sense that Hickman put out statements. And then I think the only question we're left with is the one Justice Barrett flagged, which is how is a listener going to understand those statements? That's a fact question that's typically not suitable for resolution on summary judgment. That's the crux of our case. Justice, I'm sorry. I'm not even sure I want to ask my question anymore, Mr. Houston. Let me come at it this way. I understand your point about this case being a little different, but, you know, Twombly Iqbal talking about whether you have an antitrust conspiracy versus maybe it was entirely rational independent conduct, right, the Baby Bells, right — Yes. — a not-to-compete-with-one-another's territory.  It seems like a whole different world. At any rate, there the question was, hey, everybody knows that they're not going into each other's territory, but it could be explained by two possible intents, and it was the burden of the plaintiff to rule out, plausibly rule out, the non-problematic intent. And I think what Justice Jackson is getting at is why isn't this case just like that? Why isn't that the question? I understand your point that, well, they didn't contest it, but it is your burden on a motion to dismiss stage to rule out that lawful intent, that, hey, this is puffery for investors, and this can be plausibly explained by that rather than infringement. I think I would say two things, Your Honor. The first is that it's very hard for me, sitting here in the Supreme Court of the United States, to put myself in what arguments we would have made if HICMA, in a motion to dismiss, had said, we want to contest our unlawful intent the same way the defendant in Twombly contested its intent. You're absolutely right. Twombly was an intent case. That was where all the action in the case was. Did the defendants have an unlawful intent? HICMA did not contest its unlawful intent at this stage. So I just think it's a different, but I mean, the other point I would make is, though even that kind of intuition, even a, if you think, okay, there's an alternative explanation for the press releases, which is that they were aimed at investors. That cannot explain HICMA's website where it's described, it describes its product as a treatment for hypertriglyceridemia, the infringing use, instead of, as all the other generic companies do, as a treatment for severe hypertriglyceridemia. So here again, I think you can't, even that conception of the case cannot carve out all of the allegations we have made, all of which add up together to support HICMA's unlawful intent and their active steps that had the effect of inducing infringement. And that is fundamentally what we're going to be held to the burden to prove, as in all other cases of induced infringement. We're going to show that the infringing sales of our product happened faster and to a greater degree than would have occurred had HICMA not made these statements. And so again, I understand the court's concern about the idea that, you know, and I think my friends have attempted to say, this is going to devastate the generics market. Nobody wants to devastate the generics market. But it's just factually not true. And the surest reason you can know it's not true is because there's seven other generics in this market selling this product who know how to market their product lawfully. And all that HICMA needed to do was follow that path, and they wouldn't be here just like the other generics aren't here. Mr. Yousef, my sense of your papers in this court, as compared maybe to your papers below, is that you've really dialed down your reliance on the skinny label. So could you tell me why that is, if I'm right about that? And more to the point maybe, what is your view of the relevance of the skinny label? Would you go, would you accept Mr. Stewart's proposition that that label has no relevance? And if not, why not? Justice Kagan, I would not accept Mr. Stewart's proposition that that has no relevance. And I think the reason for that is that this court is not accustomed in pleading cases and in Section 271B cases to saying there's a category of evidence that's sort of fundamentally off the table. That to me sounds like the creation of a safe harbor, and I think that's a legislative task fundamentally. Now, to be sure, HICMA has, you know, I don't think HICMA could be held liable, or you know, I think that there is a protection in the statute in Hatch-Waxman for HICMA to prepare a skinny label. That's why, as the federal circuit said, the skinny label is not the heart of our case by any means. It is one piece of evidence. Well, why should it be one piece of evidence? Sure, because again, I don't think that the court has generally said there's sort of evidence that's off the table. But the way I think about the label in this case, because keep in mind, the label comes factually later in time. So it's really at the moment that Vasipa is getting all of this amazing press attention that doctors are prescribing it en masse to, for the first time, really effectively treat patients with severe cardiovascular risk. It's into that market that HICMA launches all of its offensive statements about generic Vasipa, billion dollars in sales, hypertriglyceridemia, and the like. Then it comes out with its label. And the way I think about the label is the label was an opportunity for HICMA to try to sort of mitigate the damage from its unlawful statements, and it didn't take it. And in that sense, I think the HICMA label maybe, you know, probably arguably exacerbated our harm. But that's the way I think about the label. It is definitely not the key contention that we rely on, because again, it's not the thing that distinguishes HICMA from all the other generic manufacturers. They were... It was those generics made all of these statements that HICMA did not make, and I think that's why they're here. That's why they're not here, and HICMA is. The label just was an opportunity missed by HICMA to try to control the extent of the infringement after they had already rang the bell. I think I just want to spend one moment, if I might, talking about where the court would go from here if it found that this is a Twombly-Iqbal case and that the allegations in the current complaint did not suffice to state a claim for relief. I think, as we've described in our brief, the court's far and away most common practice in that situation would be to vacate the Federal Circuit's opinion and remand. It would not be to enter the form of judgment in this court that HICMA requests, which would be to sort of declare the case over. And I think that disposition... Again, you know, obviously, we hope that you will agree that the complaint here does state a claim, but in the event the court didn't, it would be especially important for the court to allow the case to proceed back on remand, because since the Federal Circuit remanded the case and since HICMA did not stay the mandate, extensive discovery has occurred. Millions of documents have been exchanged, 12 depositions have been taken, and that has revealed substantial new evidence of HICMA's intent to infringe. So are you saying you would amend your complaint? Absolutely, Your Honour. We very much want the opportunity to amend that would normally be the course under the Federal Rules of Civil Procedure. And all I'm trying to say is I think the case for our opportunity to amend is even stronger here, given that there's been a material change in the case since the Federal Circuit's opinion. We've uncovered all of this new evidence. Well, Judge Andrews granted a motion to dismiss, right? Yes, Your Honour. But... And we have successfully appealed that judgment. So... He's talking about what happened in the district court. That's right. And so, again, the case has the same posture as all the cases cited on, I think, page 51 of our brief. A district court judge grants a motion to dismiss. We elect to appeal that judgment. We successfully appeal it. The Federal Circuit reverses. There is no stay of the mandate by my friends on the other side. Case returns to district court. Judge Andrews opens discovery. And we take substantial discovery, and discovery does its job. It reveals that exactly what we allege about HICMA's intent and the effects of their statements is true. And we haven't yet had an opportunity to bring that out. But, you know, obviously, in this situation, we very much want that opportunity to bring that evidence. And what I don't think is supported is HICMA's sort of very unusual ask that this court would simply declare case over. I'm not aware... We wouldn't enter judgment, but we would reverse and remand for further proceedings, consistent, and I would take it, the Federal Circuit would then send it back to the district court. The district court would say, OK, the motion is dismissed as granted, as I said, many years ago now. And you could then file a motion for leave to amend. Is that about right? I think that's about right, Your Honor. With a slight tweak, I think actually what would happen probably is the Federal Circuit would remand, and we would then go to the district court, and he would say, I'm supposed to have further proceedings consistent with the Supreme Court's opinion. What should those proceedings be? Our requested proceeding is gonna be unamended complaint. Yeah, yeah, of course. And that's what... All I'm saying is I think Hickman is trying to tell you we shouldn't have that right, and I just don't think anything in the law... I just wanna make sure the way I describe it is how you'd foresee it. You agreed with Justice Gorsuch, right? I agreed... I agreed with... Let me try to be as clear as I can. I shouldn't have asked it, I'm sorry. I thought you agreed with Justice Gorsuch. I think I mostly agree, and I hope I agree in full, but I think the right way to think... I just wanna make sure that there would be an opportunity... The district court judge would entertain a motion to amend the complaint.  That's what we want an opportunity to do. That's what Hickman's telling you we should not have the opportunity to do. Yeah, but this court doesn't normally weigh in on... We're not gonna weigh in on that. We would just remand. You can argue to the district court, right, as Justice Gorsuch said. I think that is your typical practice. Again, I'm trying to oppose the sort of extraordinary requests that I think my friends on the other side are asking. I'm sure they'll address it on rebuttal. Okay. Thank you. Anything further? Anything further? Further down? No. Anything further? Okay. Thank you, counsel. Thank you. Rebuttal, Mr. Klein. Thank you, Your Honor. I wanna start by addressing this point with no specifics that somehow new evidence came up at discovery that supports a claim for active inducement. Just to be clear, there is no such evidence, no evidence that Hickman somehow intended its archived, pre-launched, litigation-related press releases to induce infringement or its online product catalog to induce infringement. Zero evidence. The dismissal below also was with prejudice, and it was with prejudice because Amarin conceded to that judgment, and so if the court were to remand, the only thing left, if the court were to reverse and remand, the only thing left would be a Rule 60 motion, and Amarin could file that if they wish. I do want to address this argument that the conduct element turns on how a physician would understand vague and equivocal statements. That is not the standard when there's an obvious alternative explanation. Twombly and Iqbal make it very clear. If there's an obvious alternative explanation, a complaint doesn't survive the pleading stage just because maybe some physician out there might possibly read an instruction to infringe into an equivocal or vague statement like generic version of FICIPA, and there are obvious alternative explanations for all the accused statements in this case. The press releases that are accused were all archived as of the launch. They concern litigation victories, and the only indication mentioned is FICIPA's non-infringing indication. At the time of launch, and this is in the record, the November 2020 press release, so this is when the product's first available, makes it clear the product is only approved for the non-infringing indication and not approved for any other indication, and it has all the labeling information in the press release itself. There's no way that induces infringement. I do want to talk about the webpage because I don't think my friend accurately characterized the webpage. The webpage refers to an AB rating for hypertriglyceridemia, which is a lot of jargon, but the jargon is conceded and explained in the complaint and in the decision below, and it means therapeutically equivalent only as labeled to reduce high triglycerides. That's what it means. The label is linked to the webpage, so there is no plausible way to read that webpage as somehow encouraging doctors to go off-label and use the product for a patented method that has been carved out. That is not plausible. The obvious alternative explanation is the plain reading of the webpage. Thank you, counsel. The case is submitted.